Certiorari Denied, August 21, 2013, No. 34,267

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2013-NMCA-098

Filing Date: July 3, 2013

Docket No. 31,357

DAN LOPER d/b/a RIO LECHE DAIRY CO.,

Plaintiff-Appellant,

v.

JMAR, a New Mexico General Partnership,

Defendant-Appellee.

APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY
David P. Reeb Jr., District Judge

Law Offices of Felicia C. Weingartner, P.C.
Felicia C. Weingartner
Albuquerque, NM

Dominalaw Group PC LLO
David A. Domina
Omaha, NE

for Appellant

Beall & Biehler
Gregory L. Biehler
Albuquerque, NM

for Appellee

OPINION

**VIGIL, Judge.**

{1}     In this negligence case, the district court granted summary judgment to Defendant

1

(JMAR) in two separate orders. First, the district court ruled that the doctrine of circuity of actions bars Plaintiff's claims. Secondly, the district court granted summary judgment when it ruled that the opinions of Plaintiff's expert on causation are not admissible as not being based on the facts of the case. We reverse both orders.

## I.      BACKGROUND

**{2}**      Plaintiff, Dan Loper, d/b/a Rio Leche Dairy, hired JMAR, a contractor, to design, build, and deliver a new, turn-key fully operational dairy. JMAR subcontracted the electrical work on the dairy to Kyle Snider, d/b/a Snider Electric (Snider Electric). When the dairy was delivered, Plaintiff noticed problems with the milk production of his dairy cattle. After considering and eliminating other causes of low milk production, such as milking practices and nutritional needs of the cows, Plaintiff hired an electrician, Precision Electric, to conduct an electrical survey of the dairy. Precision Electric found electrical wiring defects in the dairy and corrected them. The opinion of Plaintiff's expert, LaVerne Stetson, is that the wiring defects resulted in stray voltage at the dairy which adversely affected the production of milk by cows in the herd.

**{3}**      Plaintiff sued both JMAR and Snider Electric for losses in milk production he alleged occurred as a result of JMAR's negligence in its construction and design of the dairy and Snider Electric's failure to properly install the electrical system in the dairy. Plaintiff also brought breach of contract claims against JMAR, alleging that JMAR failed to supply contracted improvements at the dairy, such as additional buildings, sheds, and equipment.

**{4}**      At the outset of the litigation, JMAR sent Snider Electric a letter, demanding indemnification for any liability imposed upon JMAR as a result of Snider Electric's negligent installation of the electrical system. Plaintiff and Snider Electric then settled their claims before trial, and Snider Electric was dismissed from the lawsuit. In relevant part, their agreement requires Plaintiff to indemnify Snider Electric as follows:

> [Plaintiff] agrees to defend, indemnify, and hold Snider [Electric] and [its] insurer harmless from and against any claims, or judgment of liability for indemnity or contribution which arises by, through, or under JMAR . . . which arises in any way from the circumstances and claims set forth in the lawsuit.

> [Plaintiff] agrees to reduce any judgment which is obtained against JMAR . . . to whatever extent is necessary to extinguish any claim which JMAR . . . would otherwise have against Snider [Electric] for indemnity or contribution. It is the intent of the parties that neither Snider [Electric nor its] insurer have any liability to any person or entity as a result of the lawsuit beyond the payment . . . described in . . . this agreement.

**{5}**      Based upon Plaintiff's agreement to indemnify Snider Electric, JMAR filed a motion

2

for summary judgment, asserting that Plaintiff's agreement to indemnify Snider Electric created a circular chain of indemnification because of Snider's obligations to indemnify JMAR for its negligence and that Plaintiff's claims were therefore barred under the doctrine of circuity. The district court granted the motion, concluding that the doctrine of circuity prevented Plaintiff from asserting claims dealing with electrical matters against JMAR that arose "out of the conduct of Snider Electric."

{6}     The district court also granted JMAR's motion to exclude the testimony of Mr. Stetson. This resulted in a second order of summary judgment in JMAR's favor because without Mr. Stetson's testimony, Plaintiff was unable to prove that stray voltage caused the problems with milk production.

{7}     Trial proceeded on Plaintiff's remaining contractual claims against JMAR. Judgment on the jury verdict in JMAR's favor was entered on the contractual claims, and Plaintiff now appeals from the summary judgment orders.

## II.     ANALYSIS

{8}     Plaintiff raises two issues on appeal: (A) that the district court erred in granting summary judgment to JMAR on all claims related to the electrical issues at the Rio Leche Dairy based on the doctrine of circuity; and (B) that the district court erred in granting summary judgment due to its erroneous exclusion of the opinion of Mr. Stetson, Plaintiff's expert.

{9}     Before addressing these issues, we resolve two arguments raised by JMAR that Plaintiff waived his right to argue them on appeal. JMAR argues that because Plaintiff went to trial on the issues not excluded by the summary judgment orders, he waived his argument regarding these claims because he did not raise the direct negligence claims against JMAR at the trial on the breach of contract claims. The summary judgment order with respect to the doctrine of circuity states: "The Court . . . finds the motion [for summary judgment] is well taken as to claims arising out of the conduct of Snider Electric . . . [, and t]he motion is granted with regard to any claims related to the electrical matters and denied as to any remaining claims." In addition, summary judgment was granted with respect "to the stray voltage claims supported by the testimony of Mr. Stetson[,]" Plaintiff's expert. We conclude that these orders together were sufficiently broad to prevent Plaintiff from asserting its negligence causes of action against JMAR at the trial on the breach of contract claims. Thus, we conclude there was no waiver of the arguments Plaintiff now makes.

{10}     JMAR also asserts that Plaintiff should have sought clarification from the district court on the scope of the orders so as to prevent waiver of these claims, and that because Plaintiff approved the orders as to form, it waived its opportunity to do so. We disagree that Plaintiff was required to raise ambiguity of the orders in the district court that JMAR now perceives and raises for the first time on appeal. We therefore proceed to consider Plaintiff's claims of error regarding JMAR's negligence.

**{11}** "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. "However, if no material issues of fact are in dispute and an appeal presents only a question of law, we apply de novo review and are not required to view the appeal in the light most favorable to the party opposing summary judgment." *Id.*

## A.    Doctrine of Circuity

**{12}** The doctrine of circuity of actions has been recognized in other jurisdictions and some federal courts to resolve lawsuits as a matter of law when a plaintiff has agreed to indemnify one defendant pursuant to a settlement while pursuing damages from another defendant who has a right of indemnity from the defendant that plaintiff has agreed to indemnify. A circular chain of indemnification results, in which the plaintiff ends up indemnifying a co-defendant for the claim that it recovered against another co-defendant. Thus, the doctrine was developed to prevent needless litigation and resolve such lawsuits as a matter of law. *See Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 594 (8th Cir. 2002) ("Generally, courts will not allow parties to engage in circuitous action when the foreseeable end result is to put the parties back in the same position in which they began."); *Moore v. Sw. Elec. Power Co.*, 737 F.2d 496, 501 (5th Cir. 1984) ("When such circular patterns of indemnity develop, . . . courts resolve the matter by denying recovery to [the] plaintiffs."); *Ward v. IHC Health Servs., Inc.*, 2007 UT App 362, ¶ 14, 173 P.3d 186 (adopting the doctrine of circuity in the Utah courts and noting that although never recognized before, it likely has its roots in the same policies as the mootness doctrine). We have not yet considered whether the doctrine of circuity applies in New Mexico, and it is not necessary for us to do so in this case.

**{13}** Plaintiff has asserted negligence theories against JMAR arising from JMAR's alleged negligent design, negligent misrepresentation, negligent hiring, and negligent supervision in the construction of the dairy. JMAR argues that based on traditional indemnification rules set forth in *Otero v. Jordan Restaurant Enterprises*, it would be entitled to indemnification from Snider Electric on all of these claims because it was the passive actor and Snider Electric was actively negligent in failing to ground the wiring system. 1996-NMSC-047, ¶¶ 2-3, 14, 122 N.M. 187, 922 P.2d 569 (citing Restatement (Second) of Torts § 422(b) (1965), which states: "[a] possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same liability as though he had retained the work in his own hands to others on or outside of the land for physical harm caused to them by the unsafe condition of the structure . . . [if he has possession of the land while the work is being completed, or] after he has resumed possession of the land upon its completion[,]" and providing that a landowner is entitled to

4

traditional indemnification from the contractor under these circumstances).

**{14}** Assuming we were to adopt the doctrine of circuity, Plaintiff's claims cannot be resolved as a matter of law on summary judgment because the causes of action are based on the negligence *of JMAR* in designing the electrical system, negligently hiring and supervising Snider Electric, and negligently misrepresenting that Snider Electric was an "expert in the business of installing electrical wiring for commercial dairies." JMAR cannot seek traditional indemnification from Snider Electric on these claims because the claims have nothing to do with any alleged negligence on the part of Snider Electric. Plaintiff also asserts that he has abandoned all pure vicarious liability causes of action against JMAR that could give rise to a right of traditional indemnification and that he is only asserting against JMAR causes of action directly that are subject to comparative fault. *See* NMSA 1978, § 41-3A-1(C) (1987); *Otero*, 1996-NMSC-047, ¶ 3; *In re Consol. Vista Hills Retaining Wall Litig.*, 119 N.M. 542, 893 P.2d 438 (1995). Because a question of fact remains as to whether Plaintiff may recover a remedy solely from JMAR on the causes of action made directly against JMAR, Plaintiff's lawsuit is not barred by the doctrine of circuity at this stage of the case. Further, the agreement between Plaintiff and Snider Electric requires Plaintiff to reduce any judgment against JMAR by any amount that Snider Electric is liable to JMAR. Thus, the agreement resolves any potential claims for proportional indemnification that JMAR might have against Snider Electric under the causes of action Plaintiff has brought against JMAR. *See Kirby v. N.M. State Highway Dep't*, 97 N.M. 692, 643 P.2d 256 (Ct. App. 1982).

**{15}** The doctrine of circuity may have applicability in some circumstances under New Mexico law, where a defendant is entitled to total indemnification under traditional indemnification; however, because Plaintiff has alleged causes of action against JMAR involving its direct negligence, the doctrine of circuity does not apply to bar Plaintiff's claims at this stage in the proceeding because of our adoption of comparative fault. *See Trujillo v. Berry*, 106 N.M. 86, 87, 738 P.2d 1331, 1332 (Ct. App. 1987) (stating that notwithstanding New Mexico's adoption of comparative fault, traditional indemnification is still available in cases involving vicarious liability or strict liability, where the liability of the indemnitee arises not from its own fault, but from its relationship with the party at fault). However, that is not the case before us here.

**{16}** We therefore conclude that summary judgment was improperly granted because there remain disputed questions of fact as to whether JMAR was a passive or active tortfeasor and whether it was entitled to traditional indemnification from Snider Electric on any of the negligence claims brought directly against JMAR.

**B.     Opinion of Laverne Stetson**

**{17}** JMAR filed a motion for summary judgment asserting that Mr. Stetson's opinions are not admissible because they lack evidentiary support in the record and that without this opinion evidence of causation, Plaintiff's claims fail. Specifically, JMAR contended that

5

because Mr. Stetson is of the opinion that the amount of stray voltage necessary to adversely affect dairy animals is approximately 2 to 4 volts at a cow contact point, his opinion should be excluded because there was no objective evidence of stray voltage at the 2 volt threshold in the Rio Leche Dairy.[1]  The district court agreed and granted the motion.

{18}    Rule 11-702 NMRA provides:   "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  The admission of expert testimony lies in the discretion of the trial court.  *State v. Torres*, 1999-NMSC-010, ¶ 27, 127 N.M. 20, 976 P.2d 20; *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993).  "An abuse of discretion standard of review, however, is not tantamount to rubber-stamping the trial judge's decision," and we are not prevented from conducting a meaningful analysis of the admission of the expert testimony "to ensure that the trial judge's decision was in accordance with the Rules of Evidence and the evidence in the case."  *Alberico*, 116 N.M. at 170, 861 P.2d at 206; *see Torres*, 1999-NMSC-010, ¶ 27.  Moreover, when the trial

---

[1] *Larson v. Williams Elec. Coop., Inc.*, 534 N.W.2d 1 n.1 (N.D. 1995) describes stray voltage as follows:

> In order to understand stray voltage or neutral-to-earth voltage, one must first understand the neutral-grounded network. All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical "appliance." After exiting the "appliance" that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation.
>
> Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two. A cow's hooves provide an excellent contact to the earth while standing on wet concrete or mud, while at the same time the cow is contacting the grounded-neutral system consisting of items such as metal stanchions, stalls, feeders, milkers, and waterers. The current simply uses the cow as a pathway in its eventual return to the substation. Apparently very slight voltages can affect cattle. Evidence in this case suggested anything greater than one volt can be catastrophic to a dairy farm.

court applies a wrong legal standard in determining whether evidence is admissible, an abuse of discretion results. *See Dahl v. Turner*, 80 N.M. 564, 568, 458 P.2d 816, 820 (Ct. App. 1969). Finally, we observe that "in light of the liberal approach of our rules of evidence to the admission of evidence and the heightened qualifications of modern day jurors, any doubt regarding the admissibility of expert opinion evidence 'should be resolved in favor of admission, rather than exclusion.'" *Parkhill v. Alderman-Cave Milling & Grain Co.*, 2010-NMCA-110, ¶ 60, 149 N.M. 140, 245 P.3d 585 (quoting *Lee v. Martinez*, 2004-NMSC-027, ¶ 16, 136 N.M. 166, 96 P.3d 291) (Vigil, J., specially concurring)), *cert. quashed* 2013-NMCERT-005, ___ P.3d ___ (No. 29,120, May 10, 2013).

**{19}** It is now settled that under Rule 11-702, the admissibility of expert testimony depends upon three requirements: "(1) that the expert be qualified; (2) that the testimony be of assistance to the trier of fact; and (3) that the expert's testimony be about scientific, technical, or other specialized knowledge with a reliable basis." *State v. Downey*, 2008-NMSC-061, ¶ 25, 145 N.M. 232, 195 P.3d 1244; *accord Torres*, 1999-NMSC-010, ¶ 23; *Alberico*, 116 N.M. at 166, 861 P.2d at 202. We address each requirement in turn to determine if the district court properly excluded Mr. Stetson's testimony.

**1. Whether Mr. Stetson is Qualified**

**{20}** The parties do not dispute that Mr. Stetson is qualified to render an opinion on stray voltage in this case. We agree. Nevertheless, we set forth his qualifications because, as will become apparent, his qualifications are relevant to our analysis and ultimate conclusion that his opinions are admissible.

**{21}** Mr. Stetson's vitae is twenty-nine pages long, and we provide only highlights. Mr. Stetson has a bachelor of science degree and a master of science degree in agricultural engineering. In working on his master's degree, he took many courses in electrical engineering, as the main portion of his master's degree was focused on electrical aspects of agriculture. Mr. Stetson worked as an agricultural engineer for the United States Department of Agriculture and as adjunct professor of biological systems engineering at the University of Nebraska from 1962 to 2000. Mr. Stetson's membership in professional organizations includes the American Society of Agricultural Engineers (ASAE) since 1962, the Institute of Electrical and Electronic Engineers (IEEE) since 1989, the International Association of Electrical Inspectors (IAEI) since 1985, and the National Fire Protection Association (NFPA) from 1995-2005.

**{22}** From 1971 to 2000, Mr. Stetson conducted research by way of laboratory and field experiments on the safety, electrical requirements, and load management of irrigation and farmstead equipment. In this regard, Mr. Stetson has published 274 articles and papers. More specific to this case, six publications relate to stray voltage generally; eight relate to electrical systems for agricultural buildings; and twenty-three publications address electrical wiring of dairies, stray voltage in dairies, and the effects of stray voltage on dairy cows. He served on two panels of the National Electric Code and led in the development or revision

of most of the present electrical standards that apply to agriculture. Mr. Stetson also developed instrumentation and techniques to detect, correct, and prevent stray voltage in agricultural buildings, including dairy barns, and he helped develop American Society of Agricultural & Biological Engineers (ASABE) standards for electrical installations in rural buildings and to protect against stray voltage and other risks.

**{23}** Mr. Stetson is a principal author of the "Wiring Handbook for Rural Facilities" published by the Midwest Plan Service as MWPS-28 (3d ed. 2006) that is in common use nationally. Midwest Plan Service is an educational consortium of twelve universities and the United States Department of Agriculture headquartered at Iowa State University. In addition, Mr. Stetson was a key instructor numerous times in a three-day "Stray Voltage Investigators" short course offered by the University of Wisconsin at Madison, and he also conducted day-long courses in detecting and correcting stray voltage for personnel and electricians of Rural Power Supplies in South Dakota, Minnesota, Iowa, Colorado, Texas, and Nebraska.

**{24}** Since 2000, Mr. Stetson has worked as a consulting engineer and served as an expert witness in sixteen separate matters. He has been qualified to testify as an expert witness by courts in Nebraska, Oklahoma, Michigan, Wisconsin, and Idaho, and he has testified or given expert opinions in cases in Nebraska, Kansas, New York, Idaho, Missouri, and Minnesota, which settled.

**2.      Whether Mr. Stetson's Testimony Will Assist the Trier of Fact**

**{25}** The requirement that the testimony be of assistance to the trier of fact is primarily one of relevance. *State v. Anderson*, 118 N.M. 284, 291, 881 P.2d 29, 36 (1994). If an opinion is not sufficiently tied to the facts in the case, it will not assist the jury in resolving a factual dispute in the case. *Downey*, 2008-NMSC-061, ¶ 30. We therefore examine whether Mr. Stetson's opinions are tied to the facts of the case and therefore relevant.

**{26}** Mr. Stetson followed a defined analytical process to arrive at his conclusions. First, he knew there was a potential stray voltage problem at the Rio Leche Dairy. Second, he reviewed the data produced by Precision Electric, noted the items it found regarding how the dairy was improperly wired by Snider Electric, and the corrections Precision Electric made. The Precision Electric data revealed numerous deficiencies, failings, and faults in how Snider Electric installed the electrical systems in the dairy, all of which have been found to cause stray voltage. His third step was to examine the deposition of Mr. Snider, where he learned how Snider Electric wired the dairy. Mr. Snider's deposition also revealed that Mr. Snider was unaware of the requirements of Chapter 547 of the National Electric Code on how to wire an agricultural building. In fact, Mr. Snider did not even know that Chapter 547 of the National Electric Code existed. Based on the foregoing information, Mr. Stetson formulated his initial conclusions, and his final step was to speak to Plaintiff. Plaintiff told him that after Precision Electric corrected the work done by Snider Electric, the cows came in easier into the barn and they milked faster, without any change in their feed.

8

**{27}** When he completed his analysis of the data, Mr. Stetson submitted an affidavit setting forth the following findings:

- When the Rio Leche Dairy was built, no plans, drawings, or specifications existed to govern the construction. The only blueprints or drawings related to the project were for the electrical panels in the equipment room. There was no wiring lay-out for the rest of the building so there was, and is, no standard, direction or guide available for workmen to follow during construction, or for the inspectors to inspect thereafter.

- Persons involved in construction had no experience with wiring dairy facilities, and in fact, both the general contractor [JMAR] and the electrical contractor [Snider Electric] acknowledge they had never heard of stray voltage and did not know what it was at the time.

- Stray voltage happens in circumstances which are hard to detect and must be carefully protected against during the construction process. Construction of a dairy facility, without an awareness of stray voltage, its risks, and the construction outlined in MWPS-28, creates a dramatic risk that stray voltage will develop during the dairy parlor's use, at times not necessarily predictable.

- Milk cows are hypersensitive to electrical current. Stray voltage harms milk cow production because it affects the cow's behavior, causing the cow to let down less than all her milk.

- The work performed by Precision Electric, including the work papers . . . reviewed, discloses that stray voltage was identified as present in the Rio Leche Dairy parlor. Corrective steps were taken immediately after it was discovered. Those steps, taken by Precision [Electric], which was a company knowledgeable with dairy parlor construction and wiring, appear to have eliminated the stray voltage problem on the farm.

Based on these findings, Mr. Stetson concluded:

- The precise, pinpoint source of stray voltage at Rio Leche Dairy cannot be ascertained now and may not have been at any time except as Precision Electric was able to eliminate it with the work [it] performed as disclosed in its records. Precision's work indicates that the most probable source of stray voltage was with problems in the original construction of the project.

- I am reasonably certain, based on my education, training, and experience, and information disclosed about the manner in which the dairy parlor was constructed, that its development of stray voltage over time was inevitable

and stray voltage actually did develop within the facility. This occurred because large amounts of electrical current are used in a mechanical system as complex as a dairy facility; to use it without injury to animals, the dairy facility must be grounded in a reasonable fashion that complies with the constructions standards of MWPS-28. When stray voltage is not [properly] prevented by proper grounding, stray voltage can develop.

**{28}** These opinions were subsequently explored in Mr. Stetson's deposition. Mr. Stetson confirmed his opinion that there was a sufficient amount of stray voltage at the Rio Leche Dairy to affect milk production when Precision Electric started its work. Mr. Stetson repeated that the deficient and improper wiring of the Rio Leche Dairy by Snider Electric, in his opinion, caused stray voltage to occur. Mr. Stetson testified:

> The wiring that Precision Electric determined there was improper connection of neutrals in grounds, which the neutral current then gets on the grounded current and that can affect animals. There was improper grounding of the metal. There was the improper wiring. There was improper selection of wiring materials, metal conduit, which can also carry current. So the wiring methods that [Snider Electric] used and the wiring materials with all the things that we know cause stray voltage. So when we find stray voltage, the thing you do is you correct the grounding. You correct the grounds and neutrals, and you correct the equipment to make sure it's nonconductive.

Mr. Stetson then elaborated in greater detail on each of the wiring deficiencies and how they cause stray voltage.

**{29}** Mr. Stetson was also informed by Plaintiff that before Precision Electric did its work, the cows were reluctant to enter the barn, and milking time took longer. Moreover, it was "very significant" to Mr. Stetson that after Precision Electric completed its work, milk production improved dramatically.

**{30}** Based on the foregoing information and data, Mr. Stetson testified he was confident to a reasonable degree of scientific certainty, based on his engineering judgment, that the way the dairy was grounded and wired caused stray voltage in a quantity sufficient to affect milk production.

**{31}** We conclude that Mr. Stetson's opinions are sufficiently grounded in the facts of the case and relevant. Specifically, they are of assistance to the jury in deciding whether negligence resulted in stray voltage being present in the Rio Leche Dairy. *See* Rule 11-401 NMRA (stating evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence, and . . . the fact is of consequence in determining the action").

**3.      Whether Mr. Stetson's Opinions Are Reliable**

**{32}** We now come to the pivotal question posed under this issue. In his initial affidavit, Mr. Stetson expressed his opinion that "[t]he amount of stray voltage necessary to adversely affect dairy animals is approximately 2 to 4 volts." In his subsequent depositions and affidavit, he never wavered from this opinion. Further, he testified that authoritative literature, such as the 1991 United States Department of Agriculture (USDA) publication, "Effects of Electric Voltage/Current on Farm Animals," (commonly called the "Redbook"), states that the amount of stray voltage necessary to affect dairy animals is approximately 2 to 4 volts, and that this threshold is verified by further research.[2]

**{33}** However, Mr. Stetson acknowledged that there was no objective evidence of stray voltage meeting this threshold in the Rio Leche Dairy. In order to feel comfortable in reaching a scientific conclusion, Mr. Stetson would want an appropriate stray voltage investigation conducted, following proper protocols. In this regard, Mr. Stetson recommended taking voltage measurements at least at four different cow contact points at a facility, and the measurements are ideally made over a period of time, at least over two milkings by a digital or analog paper graph recording changes in voltage at various intervals over that period of time. He would want to graph voltages between two points at various intervals during that period of time covering two milkings, and the measurements would be between a reference ground rod and one of the four cow contact points selected at the dairy. In addition, he recommended using a 500-Ohm shunt resistor between the two contact points to simulate the resistance of a cow when measuring the volts. However, such a stray voltage investigation was never conducted in this case.

**{34}** Precision Electric did not do a graph to measure the voltage over time, and it did not use a 500-Ohm shunt resistor. Most electrical contractors such as Precision Electric do not have the necessary equipment, and only people who specialize in stray voltage investigations would have the type of equipment used to make such measurements. Rather than conducting a stray voltage investigation, Precision Electric conducted what Mr. Stetson called a stray volt survey, and he said that based on the survey, there is no way to determine what piece of equipment or what physical pieces of the building or structures were the source of the stray voltage.

**{35}** Donald DeGray of Precision Electric testified he made visual checks and voltage checks throughout the Rio Leche Dairy and only made notes to determine what repairs to the wiring were needed. The maximum measurement made in a cow contact area was .52 volts. Thus, the measurements taken by Precision Electric were not even half of the amount of

---

[2]Nevertheless, reported cases indicate that the amount of voltage necessary to affect a cow remains a matter of dispute among experts. *See Winner Bros., L.L.C. v. Seitz Elec., Inc.*, 2009-Ohio-2316, 912 N.E.2d 1180, at ¶¶ 10-18 (discussing fact that the plaintiff's expert disagreed with the Redbook threshold); *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc.*, 700 S.W.2d 426, 434 n.7 (Mo. 1985) (en banc) ("A reading of the literature suggests that it is still a disputed point on the extent of voltage necessary to [a]ffect a cow.").

voltage necessary to affect behavior and milk production. Nevertheless, Mr. Stetson relied on Mr. DeGray's testimony that he found miswiring and corrected it and on the notes Mr. DeGray made on what was found in the dairy. "[T]here were many—several things that he fixed that are highly causative of stray voltage."

**{36}** After his deposition, Mr. Stetson submitted a second affidavit setting forth his opinions. He made it clear that his opinions were based on his knowledge, education, and training, using research applications, knowledge, and methodologies contained in peer-reviewed and peer-compiled publications. Moreover, he said, his opinions were based on sufficient data generally considered to be reliable and accepted by experts in his field. Those opinions are:

- It is more probable that stray voltage emanated from the original installation of electric parts and components at Rio Leche Dairy than from any other source. . . . [G]iven the construction techniques used and errors made, as identified in my deposition, it is far more likely the source of stray voltage was from construction deficiencies and errors [than from any other source].

- The level of stray voltage, which I believe was transient at the Rio Leche Dairy facility, was sufficient to adversely affect the production of milk by cows in the herd.

**{37}** Mr. Stetson's deposition was taken a second time. He was asked how much of his engineering opinion is based on objective facts, and how much is predicated on his engineering experience. Mr. Stetson answered, "I would say the majority was based on my experience. When I see a notation that grounds and neutrals were interconnected [at the Rio Leche Dairy], I recall the various times I saw those and corrected them and found it solved the stray voltage problem. My experience is a very large factor in that conclusion." He was then asked to quantify how much of his opinion of scientific probability was based on his engineering experience, and Mr. Stetson answered, "In this case I would say it would be probably [seventy] percent experience because all I had was the improper wiring things that Precision Electric had found and corrected. So I didn't have very much hard evidence, but I had a lot of past experience from solving problems where those types of wirings had occurred." Thus, seventy percent of his opinion is based on his engineering experience or expertise and thirty percent is based upon the objective evidence. Mr. Stetson asserted his experience-based methodology has never produced erroneous results.

**{38}** In cases where the expert testimony is based on the knowledge, training, or experience of the witness, the *Daubert-Alberico* factors do not apply. *See State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228; *see also Alberico*, 116 N.M. at 168, 861 P.2d at 203-04 (adopting factors set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) for evaluating the admissibility of expert testimony involving scientific evidence). Nevertheless, a district court is still required to ensure that the proposed

12

testimony is reliable. *Torrez*, 2009-NMSC-029, ¶ 21. "[W]hen testing the reliability of non-scientific expert testimony, rather than testing an expert's scientific methodology as required under *Daubert* and *Alberico*, the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *Id.* While this inquiry is similar to determining whether the expert is qualified, they are not identical because the inquiry under this factor is to "test the validity of the expert's conclusions." *Id.* ¶ 22.

**{39}** It is not disputed in the record before us that there was stray voltage at the Rio Leche Dairy before Precision Electric remedied the wiring installed by Snider Electric. Mr. Stetson's opinion that "[s]tray voltage harms milk cow production because it affects the cow's behavior, causing the cow to let down less than all her milk" is likewise not disputed. Finally, it is not disputed that before Precision Electric did its work, the cows were reluctant to enter the barn, and milking time took longer; after Precision did its work, milk production improved dramatically. The question before us is whether Mr. Stetson's opinion, based on his knowledge, experience, and training that there was sufficient stray voltage in the Rio Leche Dairy to affect milk production of the cows is sufficiently reliable under these facts to be admissible. Our answer is in the affirmative. The subject of stray voltage, particularly as it relates to dairy farms, has been addressed by many courts,[3] some of which inform the result we reach here.

**{40}** In *Hoover's Dairy, Inc.*, a dairy farmer obtained a jury verdict against the distributor

---

[3]*See Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 12 (Iowa 1999), listing the following cases: *Federated Rural Elec. Ins. Co. v. Nationwide Mut. Ins. Co.*, 874 F. Supp. 1204 (D. Kan. 1995) (case arose from the insured's alleged failure to prevent or causing of stray voltage problems); *Haile v. Arkansas Power & Light Co.*, 907 S.W.2d 122 (Ark. 1995) (action brought against electric utility for damages suffered to cattle allegedly caused by stray voltage); *Hegg v. Hawkeye Tri-Cnty. REC*, 512 N.W.2d 558, 559 (Iowa 1994) (per curiam) (customers alleging damage to their dairy herd by stray voltage were alleging continuing wrong and could recover for damages occurring within five-year statute of limitation); *Fox v. Interstate Power Co.*, 521 N.W.2d 762 (Iowa Ct. App. 1994) (per curiam) (dairy farmer argued against apportionment of fault in stray voltage case); *ZumBerge v. N. States Power Co.*, 481 N.W.2d 103 (Minn. Ct. App. 1992) (consumers brought suit against electric utility for damages resulting from stray voltage which injured their dairy herd); *Johnson v. Steele-Waseca Coop. Elec.*, 469 N.W.2d 517 (Minn. Ct. App. 1991) (farmer sued electric utility alleging damages to his cattle herd from stray voltage); *Hoover's Dairy, Inc.*, 700 S.W.2d at 426 (purchaser of automatic milking system sued distributor and seller alleging negligent installation for failure to test for stray voltage); *Larson*, 534 N.W.2d at 1 (farmer brought action against electric cooperative seeking recovery of damages to dairy farm allegedly caused by stray voltage); *Kuper v. Lincoln-Union Elec. Co.*, 1996 SD 145, 557 N.W.2d 748 (dairy farmers brought action against nonprofit rural electric cooperative for damages allegedly caused by stray voltage).

and seller of the milking system for negligence in failing to test for stray voltage during its installation. 700 S.W.2d at 428. The evidence showed that it had become generally known in the industry that a potential stray voltage problem can result when installing a milking system. *Id.* at 429. Further, the consequence of electrical shocks resulting from stray voltage "is that the cows become nervous during milking time and may not give all their milk. If milk remains in a cow's udder, it may lead to a bacterial infection called mastitis." *Id.* Several weeks after the system was installed, the milking time of the cows increased, the cows became nervous upon entering the barn, and there was an increase in an infection of mastitis in the cows. *Id.* at 430. After observing that proof of proximate cause may be established by either direct or circumstantial evidence, the court held that the evidence was sufficient to support the jury's finding of causation. *Id.* at 434. Specific to our case, the court said:

> [F]acts were introduced from which the jury could conclude that stray voltage was present and caused the increase in mastitis. A number of expert witnesses and numerous publications indicated that stray voltage could cause mastitis in dairy cows, a fact virtually undisputed at trial. The symptoms commonly observed as incidents to stray voltage were observed on respondent's dairy farm within weeks after the installation. Additionally, there was a dramatic increase in mastitis shortly after the installation and there was a[n] amelioration of the problem after eliminating the stray voltage. The issue, therefore, was properly a jury question.

*Id.* (footnote omitted).

**{41}** Likewise, in *Carpenter v. Consumer's Power Co.*, 584 N.W.2d 375 (Mich. Ct. App. 1998), *vacated on other grounds by* 615 N.W.2d 17 (Mich. 2000), the dairy farmer obtained a jury verdict against a power company for negligence in failing to discover and remedy stray voltage. In this case, that evidence showed that cows may be reluctant to enter a barn where stray voltage is present and that during milking, they may kick the milking equipment and people. *Id.* at 378. In addition, they will produce less milk and will produce milk unevenly, leaving milk in the udders, causing mastitis. *Id.* The dairy farmer's cows exhibited these symptoms, and after the stray voltage problem was corrected, the cows' behavior returned to normal. *Id.* at 378-79. On appeal, the power company argued that the evidence "merely demonstrated that stray voltage was present, but did not demonstrate any act or omission on the part of [the power company] that caused harm to [the dairy farmer]." *Id.* at 382. The court disagreed and concluded that the evidence supported the jury's finding that the power company's negligence was the proximate cause of the dairy farmer's damages, stating:

> There was also sufficient evidence to support a finding that defendant's breach of its duty was the proximate cause of plaintiffs' injuries. Expert witnesses, as well as defendant's own pamphlet concerning the effects of stray voltage on dairy farms, discussed the symptoms caused by the effects

of stray voltage in cows. The cows . . . displayed these symptoms. Furthermore, there was evidence that [the] plaintiffs' milk production decreased in the years before the correction of the voltage problem. Therefore, the trial court did not err in denying [the] defendant's motion for JNOV.

*Id.* at 382. In *Schlader*, the court concluded that expert testimony was not needed in a stray voltage case. 591 N.W.2d at 14. It reasoned that while the subject of stray voltage is technical, the nature of electricity and the results of contact with it by humans and animals is not beyond a common person's understanding. *Id.* In reversing summary judgment, the court said:

> A fact question is generated if reasonable minds can differ on how the issue should be resolved. The [plaintiffs] cited evidence by the milking equipment supplier that he discerned the voltage problems on their farm. There were also depositions of analysts reciting that the isolator or block installed by [the defendant] did decrease the voltage in the [plaintiffs'] milking parlor. There was also testimony from a veterinarian that related the health problems experienced by the [plaintiffs'] dairy herd. He also noted the improvement in the milking herd after the block or insulator was installed. According the [plaintiffs'] 'every legitimate inference' from their evidence, it cannot be said they have failed to show injuries to the dairy herd resulting from electric voltage in the milking parlor.

*Id.*

**{42}** While the foregoing cases focused on the sufficiency of the evidence rather than on the admissibility of expert opinions, they are nonetheless persuasive on the question of the reliability of Mr. Stetson's opinions. His testimony regarding the behavior of cows affected by stray voltage is similar to evidence presented in these other cases. Thus, Mr. Stetson could properly rely on his extensive knowledge, education, training, and experience as an agricultural engineer and unquestioned expertise on the effects of stray voltage on dairy cows to express his opinion, based on the facts of the case, that Plaintiff's dairy cows were exposed to a sufficient amount of stray voltage to adversely affect their milk production.

**{43}** The district court agreed with JMAR that a condition for the admission of Mr. Stetson's opinions was measurable stray voltage meeting the threshold of 2 to 4 volts. We conclude the district court erred in making this legal conclusion. While the absence of measurable stray voltage meeting the threshold of 2 to 4 volts goes to the weight the jury may give to his opinion, its absence does not make his opinion inadmissible. We therefore reverse this order granting JMAR summary judgment.

**III.    CONCLUSION**

**{44}** The orders granting summary judgment to JMAR are reversed, and the case is remanded for future proceedings consistent with this Opinion.

**{45}  IT IS SO ORDERED.**

_____
                              **MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**CYNTHIA A. FRY, Judge**

**Topic Index for _Loper v. JMAR_, No. 31,357**

**AGRICULTURE**
Animals and Livestock
Dairy Industry

**APPEAL AND ERROR**
Preservation of Issues for Appeal
Standard of Review

**CIVIL PROCEDURE**
Expert Witnesses
Summary judgment

**CONTRACTS**
Indemnification Agreement

**EVIDENCE**
Expert Witness
Scientific Evidence & _Daubert_ Standard

**NEGLIGENCE**
Apportionment
Comparative Negligence
Indemnification
Respondeat Superior