This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**DOREY NEZ and YOLANDA SANDOVAL,**
**as Parents and Guardians of their Minor Child,**
**and as Personal Representatives of the Estate of**
**DARNELL ANTHONY NEZ, Deceased,**

　　　Plaintiffs-Appellants,

v.　　　　　　　　　　　　　　　　　　　　　　　NO. 31,728

**GALLUP-McKINLEY PUBLIC SCHOOLS**
**and JOHN DOES 1-9,**

　　　Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF McKINLEY COUNTY**
**Louis E. DePauli, Jr., District Judge**

Caren I. Friedman
Santa Fe, NM

Kelin Law Firm, P.C.
Zackeree S. Kelin
Albuquerque, NM

Law Offices of Butch O'Neal
Leo R. (Butch) O'Neal
Albuquerque, NM

for Appellants

Narvaez Law Firm, P.A.
Henry F. Narvaez
H. Nicole Werkmeister
Albuquerque, NM

for Appellees

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

{1}     Plaintiffs, Dorey Nez and Yolanda Sandoval, filed claims for personal injury and wrongful death in connection with the injury and subsequent death of their son. Plaintiffs appeal the district court judgment in favor of Defendants, Gallup-McKinley Public Schools and John Does 1-9. Plaintiffs claim that the district court committed error in four ways:  (1) by allowing Defendants' expert, Dr. G. Theodore Davis, to testify; (2) by not considering the deposition testimony of a witness who testified differently at trial; (3) by failing to apply res ipsa loquitur; and (4) by misapplication of the eggshell skull rule.  We affirm the holding of the district court that Defendants are not liable.

**BACKGROUND**

**{2}** Plaintiffs' son, Darnell Nez, was born with a very rare, progressive neurological condition. As a consequence, he could not walk, talk, or care for himself. Additionally, he suffered from severe osteoporosis. The weakened state of Darnell's bones is the cornerstone of this case.

**{3}** On March 25, 2004, Darnell suffered a spiral fracture of his left leg. That day, Darnell's father dropped him off at Chee Dodge Elementary School, where Darnell was enrolled. Darnell was lifted from the car and into his wheelchair by his father. One of the special education aides assigned to Darnell, Charlene Williams, then took custody of him. A little later in the morning, Williams took Darnell from the regular classroom to the special education classroom earlier than scheduled because he was crying and distracting the other students. She testified that Darnell was still crying in the special education classroom and that these cries were different from his usual cries. Williams decided to take Darnell out of his wheelchair to investigate the source of his discomfort.

**{4}** Upon removing his pants, Williams discovered that Darnell's leg was "swollen like a balloon." By then, another aide was in the room, and she also noted that Darnell's thigh was red and swollen. Darnell's mother, Yolanda Sandoval, was subsequently called, and she came to the school. Ms. Sandoval then took Darnell to the Tohatchi Clinic. At the Tohatchi Clinic, it was determined that Darnell had a

3

fractured femur. From the Tohatchi Clinic, Darnell was transported to Gallup Indian Medical Center, and from there, to University of New Mexico Hospital (UNMH).

{5} While at UNMH, Darnell's condition worsened, and he was soon moved to intensive care. He developed a treatment-resistant form of Staphylococcus Aureus, was intubated, and spent nearly one month in a coma. After going home from the hospital, Darnell was more medically fragile than before the accident, required oxygen, and never again ate solid food. Darnell died on December 24, 2005.

{6} Plaintiffs sued the school system, alleging negligence while Darnell was in his school's care on the day he broke his leg and alleging that his death was a result of the broken leg. After a bench trial, the court found in favor of Defendants. The court determined that Defendants owed Darnell "a duty of care to physically handle him in such a way as to minimize the stress or force placed upon his bones so his bones would not break." The court also found that "due to the very weak state of [Darnell's] bones, Darnell was subject to fracture, including spiral fracture, from virtually any routine non-negligent handling." The court ruled that Defendants did not breach their duty. Plaintiffs appeal.

**EXPERT TESTIMONY OF DR. G. THEODORE DAVIS**

**{7}**     Plaintiffs filed a motion in limine to exclude the testimony of Defendants' expert witness, Dr. G. Theodore Davis.  Plaintiffs assert on appeal that the motion in limine was erroneously denied.

**{8}**     The parties concur that the admission of expert testimony rests in the sound discretion of the district court and that a court's judgment on this issue will not be overturned absent abuse of that discretion. *State v. Alberico*, 1993-NMSC-047, ¶ 58, 116 N.M. 156, 861 P.2d 192.  The discretion of the district court is broad, and such judgment will be sustained unless manifestly erroneous. *Id.*  Any doubt about the "admissibility of expert opinion evidence should be resolved in favor of admission, rather than exclusion." *Loper v. JMAR*, 2013-NMCA-098, ¶ 18, 311 P.3d 1184 (internal quotation marks and citation omitted), *cert. denied*, 2013-NMCERT-008, 309 P.3d 100.

**{9}**     The admission or exclusion of expert testimony in New Mexico is governed by Rule 11-702 NMRA. Rule 11-702 establishes three prerequisites for admission of expert testimony:  "(1) experts must be qualified; (2) their testimony must assist the trier of fact; and (3) their testimony must be limited to the area of scientific, technical, or other specialized knowledge in which they are qualified." *State v. Torres*, 1999-NMSC-010, ¶ 23, 127 N.M. 20, 976 P.2d 20.

{10} Plaintiffs argue that it is "questionable" whether Dr. Davis was qualified to testify because the last spiral fracture he treated was more than twenty-five years prior and because the majority of cases for which he offers expert testimony are soft tissue and low impact injuries. Plaintiffs also argue that Dr. Davis's opinions that a spiral fracture can be "spontaneous" and that Darnell's fracture may have been caused by a muscle contraction were scientifically unreliable.

{11} Dr. Davis received his medical degree from Emory University School of Medicine in 1976. He has been board certified in emergency medicine continuously since 1990. Orthopedics, pediatrics, and trauma are included within emergency medicine, as defined by the American Board of Emergency Medicine. He has been recognized in state and federal courts as an expert in emergency medicine. He has taught part-time at the medical school at the University of South Carolina in Charleston and also at the University of New Mexico School of Medicine. Dr. Davis supported his theory of spontaneous fracture in children with weakened bones with two articles published in medical journals. In the medical context, according to Dr. Davis, the term "spontaneous" does not mean entirely without force, but instead means with minimal force. Dr. Davis noted that his theory that Darnell's fracture may have resulted from a muscle spasm was extrapolated from fractures reported and

6

studied in cerebral palsy patients, who, like Darnell, suffered from involuntary muscle spasms.

{12}   The district court appears to have relied not on Dr. Davis's theory that a muscle spasm may have caused Darnell's fracture, but instead on the testimony of other experts. The district court found that "a spiral bone fracture can only occur through the application of torque to the bone." Plaintiffs called three experts, each of whom testified that spiral fractures are caused by torque or twisting.

{13}   The district court also found that because of "the very weak state of his bones, Darnell was subject to fracture, including spiral fracture, from virtually any routine non-negligent handling." Plaintiffs contend that this finding must be grounded in the testimony of Dr. Davis because without the testimony of Dr. Davis, this finding is unsupportable. However, there is significant other support in the record for the district court's finding. Plaintiffs' expert, Dr. Elizabeth Szalay, is acknowledged to be a worldwide expert in bone density in children. Dr. Szalay evaluated both the dual energy absortiometry scans performed on Darnell, which tested his bone density, and the x-rays of his broken leg. She testified that an "insufficiency fracture" is a fracture that "occurs with minimal trauma as a result of the bones being weak" and that Darnell was weak enough to incur such a fracture. Dr. Szalay testified that, "in general, [she] would classify something as an insufficiency fracture if a specific

7

mechanism [of injury] could not be identified." Reviewing Darnell's x-rays, Dr. Szalay noted that Darnell suffered a "moderately displaced" fracture. She testified that for a child like Darnell, a femur fracture could have resulted from "any care maneuver," such as "putting on a garment," "turning over in bed[,]" or "bathing[.]" Dr. Szalay testified that Darnell's fracture could have happened without any negligent act. We conclude that the finding of the district court that Darnell was subject to fracture from virtually any non-negligent handling is supported by Dr. Szalay's expert testimony.

{14}     Because Dr. Davis was qualified as an expert to testify about emergency medicine, and because his opinions were sufficiently grounded in medical science to be of potential assistance to the trier of fact, the district court was within its discretion to hear his testimony. Furthermore, even assuming that his testimony was improperly admitted, there was no reversible error because we do not conclude that the district court relied on his testimony. *See State v. Hernandez*, 1999-NMCA-105, ¶ 22, 127 N.M. 769, 987 P.2d 1156 ("We presume that a judge is able to properly weigh the evidence, and thus the erroneous admission of evidence in a bench trial is harmless unless it appears that the judge must have relied upon the improper evidence in rendering a decision."); *see also In re Doe*, 1976-NMCA-102, ¶ 19, 89 N.M. 700, 556 P.2d 1176 ("Erroneous admission of evidence is not reversible error in a non-jury

proceeding unless it appears that the court must have relied upon such evidence in reaching its decision.").

**TESTIMONY OF VIOLET HUDSON**

{15}    Plaintiffs contend that the district court committed reversible error by refusing to consider the deposition testimony of Violet Hudson.  Hudson's testimony at trial contradicted her deposition testimony.  At trial, Plaintiffs impeached Hudson's testimony using her deposition.  The subject matter of the contradictory statements is whether Hudson's colleague Charlene Williams lifted Darnell on her own, or whether she was assisted by Hudson.  Whether Darnell was lifted using a one-man lift or a two-man lift is important because the policy of the school district for Darnell called for a two-man lift.

{16}    Plaintiffs' argument is based on the district court's statement that it "cannot rely on the deposition testimony of Hudson to conclude that Williams moved Darnell with a one-man lift."  The issue is whether the district court's statement is a ruling as a matter of law, which would be incorrect, or a finding based on the weighing of the evidence, which is within the discretion of the factfinder.  *See* Rule 11-801(D)(1)(a) NMRA (stating circumstances under which a party may use a declarant-witness's prior inconsistent deposition statement for impeachment); *see also Lopez v. Adams*, 1993-NMCA-150, ¶ 2, 116 N.M. 757, 867 P.2d 427 ("It is for the [district] court to

weigh the testimony, determine the credibility of witnesses, reconcile inconsistent statements and determine where the truth lies.").

{17} We conclude that the district court weighed the contradictory evidence and found that the direct testimony of Hudson and Williams at trial to be more persuasive than the earlier deposition of Hudson. The district court noted that the evidence on whether a two-man or one-man lift was "contradictory." The district court specifically noted that Hudson contradicted her deposition testimony at trial and found that "[t]he evidence presented that Williams used a one-man lift to move Darnell is not persuasive." Viewed in context, the district court's finding that it could not conclude based on the deposition testimony of Hudson that a one-man lift was used indicates a weighing of the evidence that we will not disturb. *See Sanchez v. Saylor*, 2000-NMCA-099, ¶ 12, 129 N.M. 742, 13 P.3d 960 ("The appellate court may not reweigh the evidence [or] substitute its judgment for that of the trier of fact." (alteration in original) (internal quotation marks and citation omitted)).

**RES IPSA LOQUITUR**

{18} Plaintiffs argue that this case presents a classic scenario for the application of the doctrine of res ipsa loquitur. Plaintiffs' argument establishes both factual questions and questions of the application of the facts to the law. We review factual questions under a substantial evidence standard, and we review the application of the

10

law to the facts de novo. *State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57.

**{19}** "Res ipsa loquitur describes a set of conditions to be met before an inference of negligence may be drawn." *Mireles v. Broderick*, 1994-NMSC-041, ¶ 6, 117 N.M. 445, 872 P.2d 863. "The doctrine of res ipsa loquitur applies only when, in the ordinary course of events, an injury would not occur except by the negligence of the person in exclusive control and management of the injuring instrumentality." *Drake v. Trujillo*, 1996-NMCA-105, ¶ 24, 122 N.M. 374, 924 P.2d 1386; *Martinez v. CO2 Servs, Inc.*, 12 F. Appx. 689, 695 (10th Cir. 2001). The mere fact that an injury occurred is not grounds for concluding that a particular defendant was probably negligent. *Drake*, 1996-NMCA-105, ¶ 25. "[T]he issue is whether there is a factual predicate sufficient to support an inference that the injury was caused by the failure of the party in control to exercise due care." *Mireles*, 1994-NMSC-041, ¶ 6.

**{20}** Initially, we note that Defendants contend that the issue of res ipsa loquitur was not preserved. Indeed, the trial seems not to have focused on res ipsa loquitur but instead on other issues such as whether Darnell's injury could have resulted from a two-man lift and the viability of spontaneous fracture as a theory. However, although Plaintiffs did not mention res ipsa loquitur in their proposed findings of fact and conclusions of law, Plaintiffs requested a conclusion of law that a femur fracture with

moderate displacement does not happen in the absence of negligence, requested a finding that the injury to Darnell occurred after he entered the custody and control of Defendants, and briefly mentioned res ipsa loquitur in closing argument. Because we conclude that the issue was adequately preserved, we address whether the district court committed error when it failed to invoke res ipsa loquitur.

{**21**}    The requisite factual predicate to successfully invoke res ipsa loquitur in this case is twofold:  (1) Plaintiffs must demonstrate to the factfinder that the injury to Darnell occurred while under the control and management of Defendants, not prior, and (2) Plaintiffs must further demonstrate that the injury to Darnell could not have happened but for an act of negligence on the part of Defendants.

{**22**}    The district court focused on the second prong of the res ipsa loquitur analysis. The district court found that because of the very weak state of Darnell's bones, his injury could have been caused by either non-negligent or negligent handling. Plaintiffs contend that "all of the evidence in the case" indicates that Darnell's injury "could not have occurred in the absence of negligence."  Our review of the record indicates that substantial evidence in the form of testimony from experts called by both parties supports the conclusion that Darnell's injury could have occurred without negligence on the part of Defendants.  Plaintiffs' expert on bone density in children, Dr. Szalay, straightforwardly testified on cross-examination to this effect:

12

Q. [Defendants] Now, so any type of normal twisting motion dealing—working with this child [Darnell] could have caused a fracture, correct?

A. [Dr. Szalay] I can say that the fracture was caused by some sort of twisting . . . whether it was a fall, whether it was getting a limb caught. I can't say that any sort of twisting would have caused the fracture.

Q. And it could . . . have very well happened without any negligent act on the part of somebody, correct?

A. Correct.

Q. And why is that important to note?

A. Because any care maneuver, whether it's dressing, whether it's turning, whether it's bathing, puts a certain amount of stress on the bones. And when the bones are weak, they can fracture with—there is always stress applied to the bone, with every action, with every care, with every maneuver.

Defendants' expert, Dr. Davis, was similarly unwilling to infer a negligent act from the nature of Darnell's injury. Dr. Davis stated that he had "no indication that anything negligently was done [to Darnell] either by staff at the school, by his parents or anyone else."

{23} Plaintiffs make a semantic argument that when Dr. Szalay answered a question by agreeing that "it" could very well have happened in the absence of negligence, Dr. Szalay was referring not to Darnell's injury but instead was referring to a theoretical insufficiency fracture. In Plaintiffs' telling, the theoretical insufficiency fracture is to

13

be contrasted with Darnell's more serious, moderately displaced, fracture. Therefore, according to Plaintiffs, Dr. Szalay's testimony does not support the district court's finding that Darnell's injury could have resulted from virtually any routine non-negligent handling and, consequently, the court's finding rests exclusively on the testimony of Dr. Davis. But we do not agree with Plaintiffs' reading of Dr. Szalay's testimony. In order to discern the meaning of "it[,]" we examine the prior testimony. Dr. Szalay responded to a question about whether normal work with "this child"—meaning Darnell—could have caused a fracture, by stating that "the fracture"—meaning Darnell's fracture—was caused by "some sort of twisting[.]" Dr. Szalay was then asked if "it . . . could have very well happened without any negligent act on the part of somebody[.]" Dr. Szalay responded "Correct." We conclude that "it" referred back to "the fracture" which, in turn, referred back to the fracture suffered by "this child[,]" meaning Darnell. Contrary to the contention of Plaintiffs, when Dr. Szalay agreed that "it" could have happened in the absence of any negligent act, she was referring to Darnell's "moderately displaced" fracture.

{24}     Plaintiffs cite numerous cases in support of their position that res ipsa loquitur should be applied in this case. Three of these cases reversed summary judgment on behalf of the defendants.[1] Another five cases involved injuries or damages that the

---

[1] *DeCarlo v. Eden Park Health Servs., Inc.*, 887 N.Y.S.2d 315 (N.Y. Sup. Ct. 2009); *Persinger v. Step By Step Infant Dev. Ctr.*, 560 S.E.2d 333 (Ga. App. 2002);

factfinder found could not have occurred without negligence or were preventable by ordinary care.[2] The cases cited by Plaintiffs are unhelpful because of either different procedural posture or legally significant different findings by the factfinder.

{25}    Because Darnell's injury could have occurred in the absence of a negligent act on the part of Defendants, Plaintiffs cannot successfully invoke res ipsa loquitur. *See Tapia v. McKenzie*, 1971-NMCA-128, ¶ 12, 83 N.M. 116, 489 P.2d 181 ("If plaintiff fails to establish the essential elements of the doctrine, it would not be available to make a prima facie case of liability."). The district court did not commit error in refraining from drawing an inference of negligence. *See Pack v. Read*, 1966-NMSC-216, ¶ 5, 77 N.M. 76, 419 P.2d 453 ("[T]he doctrine [of res ipsa loquitur] permits but does not require the fact finder to draw an inference of negligence.").

**EGGSHELL SKULL RULE**

{26}    Plaintiffs argue that in finding that Darnell was subject to a fracture from "virtually any routine non-negligent handling[,]" the district court created an untenable rule foreclosing negligence in all cases with "eggshell skull" plaintiffs. Plaintiffs contend that the district court committed reversible error because, under the

Ward v. Forrester Day Care, Inc., 547 So.2d 410 (Ala.1989).

[2] *Franklin v. Collins Chapel Hosp.*, 696 S.W.2d 16 (Tenn Ct. App. 1985); *Zimmer v. Celebrities, Inc.*, 615 P.2d 76 (Colo. App. 1980); *Fowler v. Seaton*, 394 P.2d 697 (Cal. 1964); *Strong v. Shaw*, 1980-NMCA-171, 96 N.M. 281, 629 P.2d 784; Mireles, 1994-NMSC-041.

court's statement, there can be no finding of negligence in a case with an eggshell plaintiff.

**{27}** An eggshell plaintiff is susceptible to exaggerated or additional injury because of the plaintiff's existing weakness or condition. *Salopek v. Friedman*, 2013-NMCA-087, ¶ 20, 308 P.3d 139. Under the eggshell plaintiff rule, a defendant who is liable in negligence is responsible for all damages to an eggshell plaintiff even when some of the plaintiff's injury is a consequence of a special vulnerability. *Id.* Here, Plaintiffs argue that the district court turned this rule on its head such that Darnell's vulnerabilities would preclude a finding of negligence absent Defendants' admission of breach.

**{28}** We disagree. First, the statement of the district court that Plaintiffs find erroneous is not a rule but a factual determination that is supported by substantial evidence in the record. We do not reweigh the evidence on appeal. *Sanchez*, 2000-NMCA-099, ¶ 12 ("The appellate court may not reweigh the evidence [or] substitute its judgment for that of the trier of fact." (alteration in original) (internal quotation marks and citation omitted)). Also, under the statement at issue, breach of duty—including mishandling—can be proven to the factfinder in conventional ways, including eyewitness testimony and testimony of a victim. The factual determinations in this case were complicated by the fact that Darnell was unable to speak. We cannot

16

speculate as to what he might have said. The district court did not misapply the eggshell skull rule when it found that Darnell's non-negligent, ordinary handling, as well as negligent handling, could have caused his injury.

**CONCLUSION**

**{29}** For the foregoing reasons, the judgment of the district court is affirmed.

**{30}** **IT IS SO ORDERED.**

_____
       **JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Chief Judge**

_____
**M. MONICA ZAMORA, Judge**